UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM MITCHELL BOWMAN,<br><br>                      Petitioner,<br><br>v.<br><br>STEVEN C. STAFFORD, Acting United States Marshall for the Southern District of California,<br><br>                      Respondent. | Case No.:  20-cv-2250-GPC-MSB<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[ECF Nos. 1, 15]** |

     Pending before the Court is Petitioner's Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 which was filed on May 3, 2021.  ECF No. 15. Mr. Bowman petitions the Court for a writ of habeas corpus on the grounds that his extradition is barred based on the Kingdom of Scotland's failure to follow the mandatory provisions of the Treaty and because the Government has not presented competent evidence to establish probable cause to believe that Mr. Bowman committed the offenses for which extradition is sought. A hearing was held on the petition on September 24, 2021.  Upon considering the moving papers, the Government's response, the Petitioner's reply, the case record and the arguments of counsel, the Court **DENIES** the Petition.

## I. BACKGROUND

To place the instant petition in context, the Court will describe the general procedure for extraditing an individual and then the government's extradition request pursuant to such procedure in the instant dispute. *Cf. Santos v. Thomas*, 830 F.3d 987, 990 (9th Cir. 2016) ("The procedural history of this case will be easier to navigate with an overview of the extradition process in mind.").

### A. The Extradition Process

Extradition is a process where "an individual taken into custody in one country is surrendered to another country for prosecution." Ronald J. Hedges, *International Extradition: A Guide for Judges* 1 (Federal Judicial Center 2014) (hereinafter "FJC Manual"). While the responsibility of overseeing extradition is shared between the executive and judicial branches, ultimately the Secretary of State serves as "the final arbiter" in deciding whether to extradite the individual. *See id.*

The general procedure is as follows. First, the foreign state seeking extradition makes a request directly to the U.S. Department of State ("State Department"). If the State Department determines that the request falls within the operative extradition treaty, a U.S. Attorney files a complaint in federal district court indicating an intent to extradite and seeking a provisional warrant for the person sought. And once the warrant is issued, the district court—which could include a magistrate judge—conducts a hearing. This hearing is to determine whether there is evidence sufficient to sustain the charge under the operative treaty, i.e. "whether there is probable cause." *See Santos*, 830 F.3d at 991 (citing 18 U.S.C. § 3184; *Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006)). Of note, the hearing to determine probable cause is "akin to a grand jury investigation or a preliminary hearing under Federal Rule of Criminal Procedure 5.1." *Id.* (citations omitted). If the court (including the magistrate judge) determines there is probable cause, the court "is required to certify the individual as extraditable to the Secretary of State."

*Vo*, 447 F.3d at 1237 (emphases removed) (quoting *Blaxland v. Commonwealth Dir. Of Pub. Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003)).  Upon certification, the Secretary of State decides whether to extradite the individual, the final decision being discretionary.  *See id.* (citations omitted).  *See generally* FJC Manual at iv ("Overview of the Extradition Process").

Since an order certifying extradition is not appealable (because it is not considered "final" within the meaning of 28 U.S.C. § 1291), a habeas petition is the only way to challenge the certification order.  *See Santos*, 830 F.3d at 1001 (citations omitted).  The court's decision on the habeas petition may be appealed to the U.S. Court of Appeals.  *See* FJC Manual at 29.

### B. Procedural History

On December 4, 2018, the Kingdom of Scotland ("Scotland") made a formal request to the United States for the extradition of Petitioner pursuant to the extradition treaty between the United States and the United Kingdom (the "Extradition Treaty").[1] Specifically, Scotland is seeking extradition of Petitioner for: (1) three counts of lewd, indecent, and libidinous practices and behavior, and (2) two counts of rape.[2]  On November 19, 2019, the United States filed a Complaint in the Southern District of California seeking Petitioner's extradition to Scotland.  Following briefings, an extradition hearing, and supplemental briefing, Magistrate Judge Jill L. Burkhardt issued

---

[1] Extradition Treaty, U.K.-U.S., Mar. 31, 2003, S. Treaty Doc. No. 108-23 (2004) (the "2003 Treaty"), *as amended by* Instrument as contemplated by Agreement on Extradition, E.U.-U.S., art. III, ¶ 2, June 25, 2003, as to the application of the 2003 Treaty, U.K.-U.S., Dec. 16, 2004, S. Treaty Doc. No. 109-14 (2006) (the "Instrument"), *with* Annex (the "Annex") (reflecting the integrated text of the operative provisions of the 2003 Treaty and the Instrument).

[2] Scotland is not seeking extradition for one other crime that it filed against Petitioner: three counts of breach of the peace.

an Order on November 12, 2020. The Magistrate Judge's Order certified Petitioner to be extraditable. *See In re Extradition of William Mitchell Bowman*, No. 19-MJ-5089-JLB, 2020 WL 6689807 (S.D. Cal. Nov. 12, 2020) ("*In re Bowman*").

On November 18, 2020, Petitioner filed the original Petition for Writ of Habeas Corpus. ECF No. 1. The operative Amended Petition was filed on May 3, 2021. ECF No. 15. The United States filed a Response in opposition to the Amended Petition on May 28, 2021. ECF No. 18. While the Court's Order setting the briefing schedule permitted Petitioner to file a reply brief, Petitioner did not file any reply. On September 24, 2021, the Court held a hearing on the matter and at the conclusion of the hearing granted the Petitioner leave to file a reply to the Government's response. The reply was then filed on October 5, 2021. ECF No. 23.

### C. Scotland's Factual Allegations

The formal request presented by Scotland alleges the following. Petitioner was born in 1949. In 1963, at approximately 14-years of age, Petitioner was taken in by Catherine Bowman and Richard Bowman ("the Bowmans"), who had two daughters, EK and KH, and one son, RBJ. EK was born in 1959, KH was born in 1960, and RBJ was born in 1962. *See* Compl. Ex. 1, Request for Extradition 1–3, *In re Bowman*, Dkt. No. 1.

From approximately July 1963 to February 1968, when Petitioner was between 14–19 years old and when EK, KH, and RBJ were at least 10 years younger, Petitioner sexually abused EK and KH. *See id.* at 3–6. The alleged sexual abuse included giving and receiving oral sex, vaginal penetration, and bringing two neighborhood boys over to have sex with both EK and KH and masturbating while watching the acts.

EK, KH, RBJ, and the Bowmans moved to the United States in 1968. Petitioner was formally adopted by the family shortly thereafter, and he joined them in the United States in 1968 or 1969. *See id.* at 4. Petitioner's sexual abuse continued even in the United States until he was forced out of the house in July 1973. *See id.* at 4, 7.

In 2009, KH confronted Petitioner about the sexual abuse, which Petitioner admitted. *See id.* at 5–6. In 2010, EK contacted the Police Service of Scotland to report Petitioner's offenses. By October 2014, the prosecutor in Scotland received statements provided by EK, KH, RBJ, and the Bowmans. *See id.* at 7. And on April 16, 2015, Scotland issued a warrant for Petitioner's arrest. *See id.* at 9.

## II. STANDARD OF REVIEW

The Court's habeas review of the certification order is "limited to whether: (1) the extradition magistrate had jurisdiction over the individual sought, (2) the treaty was in force and the accused's alleged offense fell within the treaty's terms, and (3) there is 'any competent evidence' supporting the probable cause determination of the magistrate." *Santos*, 830 F.3d at 1001 (citing *Vo*, 447 F.3d at 1240; *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)); *see also United States v. Knotek*, 925 F.3d 1118, 1124 (9th Cir. 2019).

The Court reviews the Magistrate Judge's legal rulings de novo, and the Magistrate Judge's findings of fact for clear error. Of note, the magistrate judge's finding of probable cause is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues.'" *Id.* (quoting *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986)). Therefore, the Court must uphold the probable cause finding "if there is any competent evidence in the record to support it." *Id.* (quoting *Quinn*, 783 F.2d at 791).

## III. DISCUSSION

Petitioner challenges the Magistrate Judge's probable cause determination and questions whether the allegations in the Complaint fell within the Extradition Treaty's terms.[3] Petitioner's challenge over the Extradition Treaty's terms has several sub-

---

[3] The Magistrate Judge's jurisdiction over Petitioner is not at issue in the instant dispute. *See generally* 18 U.S.C. § 3184 (discussing the jurisdiction requirements which permits

5

arguments. First, Petitioner argues Scotland failed to provide the "text" of the law for the offense underlying the extradition request. Second, Petitioner argues Scotland's request fails to meet the dual criminality requirement in the Extradition Treaty because juvenile delinquency proceedings are civil proceedings, and because any prosecution of Petitioner in the United States would be barred under the Fifth and Sixth Amendments to the U.S. Constitution for excessive and prejudicial delay.

Ultimately the Court finds Petitioner's challenges lacking in merit and affirms the Magistrate Judge's certification order. Even under de novo review, Petitioner's alleged offense falls within the treaty's terms. Under the terms of the Extradition Treaty, Scotland provided the text of the law underlying the extradition request, and Scotland's request satisfied the dual criminality requirement. As to Petitioner's challenge of the probable cause determination, the Court considers multiple documents provided by Scotland to be "competent evidence" supporting the Magistrate Judge's decision.

## A.   The "Text" of Scotland's Law

First, Petitioner challenges the extradition based on Scotland's failure to provide "the text of the law" for the offense underlying the extradition. Am. Pet. 4-5, ECF No. 15. Article 8 of the Extradition Treaty requires that all extradition requests be supported by: "the relevant text of the law(s) describing the essential elements of the offense for which extradition is requested; [and] the relevant text of the law(s) prescribing punishment for the offense for which extradition is requested." Annex, art. 8.2(c), (d). Petitioner asserts that Scotland's extradition request fails to meet the requirements of the Extradition Treaty because the request merely described what the essential elements of the offense and resultant punishment would be if the case were to be in front of a Scottish

---

an authorized magistrate judge to conduct the extradition hearing); Crim LR 57.4.a.3 (authorizing magistrate judges to conduct extradition proceedings).

court—in contrast to providing a citation or a passage of the primary source. *See, e.g.*, Compl. Ex. 1, Request for Extradition 9–11, *In re Bowman*, Dkt. No. 1. In the extradition request, the Scottish Prosecutor explained why a description of Scotland's criminal law was provided rather than a primary source: "Scotland does not have a penal code. Criminal offences can be offences under the common law or under statute. Common law is an unwritten law, based on custom and usage and developed by case law . . . . All the crimes set out in the petition . . . are common law offences." *Id.* at 8.

Petitioner has not provided any case law which interprets "text of the law" under the Extradition Treaty as requiring a citation to a law or a passage of the primary source of the law. In the two instances where a federal district court concluded that the requesting country did not provide a text of the law as required by the treaty, such country's criminal laws were codified—thus a precise reproduction of the statutory provision was available. *See In re Extradition of Ferriolo*, 126 F. Supp. 3d 1297, 1301 (M.D. Fla. 2015); *In re Extradition of Molnar*, 202 F. Supp. 2d 782, 787 (N.D. Ill. 2002). The Scottish Prosecutor has explained that such reproduction is impossible for Scottish criminal law because the charged offenses are based on the common law, not statutory law. Here, Scotland has provided sufficient description of the underlying offenses such that Petitioner has maintained the ability to concede or contest whether the dual criminality requirement in the Treaty has been met. *Cf. In re Extradition of Ferriolo*, 126 F. Supp. 3d at 1301 (failure to provide text of the charged statutory offenses unfairly impaired Ferriolo's ability to concede or contest whether the dual criminality requirement had been met). As such, these cases do not persuade the Court that Scotland's request fails to adequately provide the text of the applicable law.

Further, the term "text" as expressed in the Extradition Treaty is ambiguous. Ambiguity in the treaty's terms must be construed in favor of extradition. *See Factor v. Laubenheimer*, 290 U.S. 276, 293 (1933) ("In choosing between conflicting

interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements."). While Petitioner cites to the Merriam-Webster Dictionary to define text as "the original words and form of a written or printed work," he omits another possible definition that is listed in the same entry: "an edited or emended copy of an original work." *Text*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/text (last visited July 21, 2021). Alternatively, the Oxford English Dictionary ("OED") defines text as "The wording of anything written or printed; the structure formed by the words in their order; the very words, phrases, and sentences as written." *Text*, OED Online (June 2021), https://www.oed.com/view/Entry/200002?rskey=7u9rH4&result=1 (last visited July 16, 2021). Under such definition, the Scottish Prosecutor's set of "worded" explanations that are "written" in her Extradition Request would constitute "text." This is true especially when the same OED entry considers a different definition—one that would insist on quoting a primary source ("Applied vaguely to an original or authority whose words are quoted")—as "obsolete."[4] *Id.* In sum, the language of the treaty is ambiguous.

Under a construction of a treaty that respects Scotland's criminal law system—one which only manifests itself via customs, principles, and precedents—a written

---

[4] OED's interpretive approach is in tune with modern semiotics, which recognizes a much broader understanding of "the text"—one that distinguishes itself from "scripture." *See, e.g.*, Sylvia Adamson et al., *Keywords for Today: A 21st Century Vocabulary* 350–53 (Colin MacCabe & Holly Yanacek eds. 2018) (interpreting "text" as "[t]he wording adopted by an editor as (in his opinion) most nearly representing the author's original work; a book or edition containing this; also, with qualification, any form in which a writing exists"); Rossana De Angelis, *Textuality*, *in Oxford Research Encyclopedia of Literature* (2020) (defining text, in part, as "a unit captured in a communication process" which "constitutes an instruction for meaning").

explanation of a law that is otherwise unwritten may constitute a "text of the law." Petitioner's interpretation would render any extradition request by Scotland based upon the common law unworkable, since there is no "text" that a prosecutor can provide to capture laws that result from customs and legal principles. This Court declines to adopt an interpretation that would unravel an entire treaty. *Cf. Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. Of Iowa*, 482 U.S. 522, 546 (1987) ("[W]e have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation.").

### B. Dual Criminality

Petitioner also challenges the extradition request for failing to meet the "dual criminality" requirement as specified in the Extradition Treaty. Petitioner argues this dual criminality requirement has not been met for two reasons. First, Petitioner argues his conduct involves juvenile delinquencies, which would not undergo a criminal proceeding in the United States. Am. Pet. 11, ECF No. 15. Second, Petitioner argues that Scotland was not diligent in pursuing extradition and that he could not be prosecuted in the United States for the underlying offenses because the Fifth and Sixth Amendments to the U.S. Constitution would prohibit undue delays in prosecution. Am. Pet. 12–13, ECF No. 15.

The Extradition Treaty expressly articulates the dual criminality requirement, and its terms guide the Court's dual criminality analysis here. *Cf. United States v. Anderson*, 472 F.3d 662, 666, 670 (9th Cir. 2006) (discussing how the doctrine of dual criminality is "incorporated into the extradition treaty" and thus how analyzing dual criminality is part of interpreting the treaty).[5] Article 2 of the Extradition Treaty states: "An offense shall be an extraditable offense if the conduct on which the offense is based is punishable

---

[5] This is in tune with the Court's limited review of certification orders, *supra* Section II.

under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty." Annex, art. 2.1. If such conditions are met, the two countries have agreed to extradite the person "for trial or punishment for extraditable offenses." *Id.* art. 1.

Applying the express terms of the Extradition Treaty to the instant dispute, Petitioner's dual criminality arguments are unavailing because Petitioner's "conduct on which the offense is based" is "punishable" under U.S. law "by deprivation of liberty for a period of one year or more." *See* 18 U.S.C. §§ 2, 2241(a)(1), 2241(c) (discussing potential life imprisonment for sexual acts either by force or with a person younger than 12 years, or aiding/abetting thereof); Cal. Penal Code § 288(a), (b)(1) (discussing punishment of at least 3 years for lewd or lascivious acts upon a child under 14 years with the intent of arousing). Whether Petitioner would have undergone a juvenile delinquency proceeding in the United States or whether the prosecution of Petitioner would be barred in the United States for undue delays are a much more expansive interpretation of the dual criminality requirement than what is permitted in the Extradition Treaty. None of Petitioner's arguments concern the *conduct*, but rather how the prosecution would materialize in the United States, which is not part of the dual criminality analysis. *Cf. United States v. Knotek*, 925 F.3d 1118, 1131–32 (9th Cir. 2019) (discussing how the dual criminality inquiry focuses on whether "the essential character of the acts criminalized is the same," not whether the elements of the offense are identical or whether the scope of the liability is coextensive/same). The Court addresses Petitioner's arguments in more detail below.

### 1. Juvenile Delinquencies

Petitioner argues that dual criminality is not met because any proceeding for the alleged conduct would have undergone a juvenile delinquency proceeding, which is civil in nature, *see United States v. Male Juv.*, 280 F.3d 1008, 1023 n.4 (9th Cir. 2002)

("Strictly speaking, juvenile delinquency proceedings are civil rather than criminal proceedings."). As an initial observation, some of the alleged conduct occurred when Petitioner was 18 years old or older, since Petitioner was born in 1949 yet the allegations state the sexual abuse continued in 1968 when Petitioner moved to the United States. *See* Compl. Ex. 1, Request for Extradition 1, 4, *In re Bowman*, Dkt. No. 1. Further, Petitioner could be prosecuted as an adult for the violation of 18 U.S.C. §§ 2, 2241(a)(1), 2241(c), even when he was a minor. *See* 18 U.S.C. § 5032 (discussing that a juvenile may be prosecuted as an adult for such violations if he was 13 years at the time of the offense). These facts and applicable criminal provisions alone render Petitioner's argument unpersuasive.

More importantly, whether the U.S. proceeding would have been civil versus criminal in nature is not the appropriate inquiry in the dual criminality analysis of the Extradition Treaty. Instead, the operative inquiry is whether the conduct would be punished in the United States by a deprivation of liberty for a period of one year or more. Even if Petitioner underwent a juvenile proceeding, a deprivation of liberty for a period of one year or more would have occurred. *See generally id.* § 5037. Thus, regardless of whether Petitioner would have undergone a juvenile proceeding or criminal proceeding, the underlying conduct constitutes an "extraditable offense" under the Extradition Treaty.

### 2. Delay in Prosecution

Petitioner also argues that dual criminality is lacking because his conduct cannot be "punishable" in the United States per the Fifth and Sixth Amendments to the U.S. Constitution. According to Petitioner, the Fifth and Sixth Amendments would bar any punishment in the United States due to the lapse of time, which occurred in this case since Scotland has not been diligent in its prosecution and extradition request. Yet in contrast to an extensive Fifth and Sixth Amendment analysis, *see* Am. Pet. 12–16, ECF No. 15, Petitioner provides no case law in which a court rejected a foreign country's

extradition request because the Fifth and Sixth Amendments would fail the dual criminality provision in the treaty. *Cf. Knotek*, 925 F.3d at 1124, 1132 (affirming the extradition order even if such would mean "uprooting a 62-year-old U.S. citizen to serve a four-and-a-half year sentence for an economic crime committed two decades ago," with no explanation in the record as to why the extradition request was delayed seven years after the arrest warrant).

Indeed, Petitioner's understanding of the Fifth and Sixth Amendments' reach to any dual criminality provision contravenes countless precedents, where "it has long been settled that United States due process rights cannot be extended extraterritorially," *Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984) (affirming habeas denial even though the extradition request was made eight years after the offense), *cert. denied*, 499 U.S. 817 (1984). *See, e.g.*, *In re Extradition of Drayer*, 190 F.3d 410, 415 (6th Cir. 1999) (affirming habeas denial despite a 14-year delay); *Martin v. Warden*, 993 F.2d 824, 827–30 (11th Cir. 1993) (17 years). As Respondent and the Magistrate Judge have pointed out, the case law provided by Petitioner concern extradition *to* the United States (i.e., requests made by the United States), not *from*. *See United States v. Mendoza*, 530 F.3d 758, 762 (9th Cir. 2008); *United States v. Fernandes*, 618 F. Supp. 2d 62, 69 (D.D.C. 2009). It makes sense for an extradition to the United States to be concerned about speedy trial, since ultimately that extradition is part of a criminal prosecution in the United States and thus the Fifth and Sixth Amendment protections would apply. In contrast, an extradition from the United States is not a criminal proceeding. *See Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir. 1976) ("Orders of extradition are sui generis. They embody no judgment on the guilt or innocence of the accused but serve only to insure [sic] that his culpability will be determined in another and, in this instance, a foreign forum."); *accord Valencia v. Limbs*, 655 F.2d 195, 198 (9th Cir. 1981). At minimum, concerns over delayed prosecution must be directed either to the Secretary of

State or the country requesting the extradition, not this Court.  *See, e.g.*, *Man-Seok Choe v. Torres*, 525 F.3d 733, 742 (9th Cir. 2008) (Secretary of State); *Kamrin*, 725 F.2d at 1227 (9th Cir. 1984) (the requesting country).

In sum, the Court declines to interpret Article 2.1 ("conduct on which the offense is based is punishable under the laws in both States") of the Extradition Treaty to mean that any potential undue delay in Scotland's request would bar extradition.  Cases have uniformly affirmed extradition despite the treaty containing a dual criminality provision and the foreign country requesting extradition years later.  Such an approach is required given the interpretative maxim to construct the treaty in favor of extradition.  *See Laubenheimer*, 290 U.S. at 293.

### C.   Evidence for Probable Cause

Finally, Petitioner challenges the probable cause determination of the Magistrate Judge.  Here, Petitioner proclaims that all Scotland has provided are allegations labeled as a "Statement of Facts," which is equivalent to a complaint.  According to Petitioner, the Scottish Prosecutor should have at least provided something to "indicate[] that she, herself, has reviewed the statements and that based on her review these are true summaries of the allegations," Am. Pet. 9, ECF No. 15.  With no indication that the Scottish Prosecutor has personal knowledge of the facts alleged and no indication on how she could conclude whether the sources of information were credible/reliable, Petitioner argues that no competent evidence exists.

As discussed *supra* Section II, "if there is *any* competent evidence in the record" to support the Magistrate Judge's probable cause finding, the Court must uphold the finding. *See Quinn*, 783 F.2d at 791 (emphasis added).  To begin, there are at least three pieces of competent evidence—beyond Scotland's Statement of Facts or the Scottish Prosecutor's allegations, i.e., the documents to which Petitioner objects—that support the Magistrate Judge's probable cause finding.  First and second, Scotland provided a photograph of the

Petitioner, and a Witness Statement by Detective Constable Paul Richardson in which KH confirmed that the person depicted in the photograph is Petitioner "who is accused in this case." Compl. Ex. 1, Request for Extradition, Annexes A and B, *In re Bowman*, Dkt. No. 1. "An identification based on a single photograph may be competent evidence of identity in an extradition proceeding." *In re Extradition of Velasquez Pedroza*, No. 19MJ1696-RBB, 2020 WL 549715, at *12 (S.D. Cal. Feb. 4, 2020) (quoting *Manta v. Chertoff*, 518 F.3d 1134, 1145 (9th Cir. 2008)). Third, Scotland provided a document prepared by the Crown Office and Procurator Fiscal Service, which directly quoted a statement made by RBJ: "[Petitioner] was looking at me. He and a few friends came over. [Petitioner] was watching his 2 friends on top of his sisters and [Petitioner] was masturbating." Compl. Ex. 1, *Extradition Request for William Mitchell Bowman*, *In re Bowman*, Dkt. No. 1. Such statements may be considered competent evidence for extradition purposes. *See Collins v. Loisel*, 259 U.S. 309, 317 (1922) ("[U]nsworn statements of absent witnesses may be acted upon by the committing magistrate . . . ."). Thus, the Court upholds the Magistrate Judge's probable cause finding even without relying on any of the documents that Petitioner contests.

Next, as to Petitioner's challenge over the conclusory nature of the Statement of Facts, Petitioner omits certain parts of the document which satisfy his demand that the Scottish Prosecutor "identify the basis for her assertions," Am. Pet. 9–10, ECF No. 15. First, the Prosecutor explicitly mentioned the photograph of Petitioner and KH's identification of Petitioner based on the photograph. *See* Compl. Ex. 1, Request for Extradition 1, *In re Bowman*, Dkt. No. 1. Second, the Prosecutor described how the evidence was collected. *See id.* at 7 (discussing EK's contact with the Scottish police and the subsequent statements obtained by both the Scottish and U.S. police). Third, the Prosecutor stated the following:

> All the evidence in this case comes from the statements provided by the victims describing what happened to them and what they saw happening at

14

> the time and, in the case of witnesses [EK] and [KH], and Richard Bowman Senior, admissions the accused has made to them since the offending. In relation the three witnesses who were children at the time of the offending, aspects of each of their statements corroborates evidence the other two have provided.

*Id.* at 13. Finally, the Prosecutor set forth the charges in great detail, organized by victim, and noted that the charges are supported by witness statements and mutual corroboration between the witnesses. *See id.* at 13–15; *see also* Dkt. No. 49 at 14 (discussing witness statements in the Statement of Facts with direct attributions to the victims). For example, the Magistrate Judge noted several instances in which the Prosecutor directly provided evidence from the victims themselves, i.e. "Witness Kato also described the accused bringing two neighbourhood boys who were around the same age as the accused to the house to have sex with her and her sister, witness Hyland . . . She describes instances in which the accused masturbated in her presence." *Id.* at 14 (citing Dkt. No. 1, Compl. Ex. 1 at 13).

      Such passages move the Statement of Facts from a conclusory document to competent evidence supporting probable cause, and provide a foundation for the prosecutor's allegations. *Cf.* Dkt. No. 15, Am. Pet. At 8 (" . . . the government must present . . . at least some foundation for the prosecutor's allegations."). "The extradition judge may consider hearsay evidence, . . . and summaries by the police or prosecutor of a witness's testimony or statement, provided that those documents are properly authenticated and . . . the governing extradition treaty does not require that a witness's statements be executed under oath." *In re Extradition of Luna-Ruiz*, No. CV 13-5059 VAP AJW, 2014 WL 1089134, at *4 (C.D. Cal. Mar. 19, 2014) (collecting cases), *aff'd sub nom. Luna-Ruiz v. Barr*, 753 F. App'x 472 (9th Cir. 2019). Here, the Statement of Facts is properly authenticated, *see* Compl. Ex. 1, Certificate of Authentication, *In re*

*Bowman*, Dkt. No. 1, and the Extradition Treaty does not require the witness's statements to be executed under oath.

With the slate of evidence discussed above, the Court finds the supporting case law provided by Petitioner to be either inapplicable or distinguishable. For example, *In re Ribaudo*, No. 00 CRIM.MISC.1PG.(KN, 2004 WL 213021, at *4 (S.D.N.Y. Feb. 3, 2004) the court found a lack of probable cause because an express provision in the extradition treaty required more than just a judgment of conviction when the person is convicted *in absentia*—a requirement that was not met. Neither that provision, nor the circumstances under which the district court reviewed probable cause in *Ribaudo*, apply here. *See Ribuado*, 2004 WL 213021 at *4; *cf.* Annex, art. 8.4(d) (requiring from *in absentia* convictions "information regarding the circumstances under which the person was voluntarily absent," which was provided by the description of Petitioner residing in the United States). In *Petition of France for Extradition of Sauvage*, 819 F. Supp. 896, 903 (S.D. Cal. 1993), the court required "a statement of the sources for the affiant's belief and the circumstances from which the affiant concluded that the sources were reliable and credible." *See Sauvage*, 819 F. Supp. at 903 (describing prosecutor's statement in a cited case as sufficient because it "contained detailed summaries of witnesses' statements."). The Scottish Prosecutor described such sources, *see* Compl. Ex. 1, Request for Extradition 7, 13, *In re Bowman*, Dkt. No. 1, and how each source corroborates another, *see id.* at 13–15.

Petitioner also relies on *In re Extradition of Platko*, 213 F. Supp. 2d 1229 (S.D. Cal. 2002). But *Platko* was more concerned about the extradition treaty's language than any precedential requirement that hearsay statements must always be vouched for in affidavits. *See id.* at 1237–39 (discussing the treaty's requirement that "statements offered in support of the Warrant be made under oath"); *cf. Matter of Yordanov*, No. CV 16-170-CAS(E), 2017 WL 216693, at *7 n.3 (C.D. Cal. Jan. 18, 2017) (distinguishing

*Platko* for the same reasons). In fact, while *Platko* relies on *Emami v. U.S. Dist. Ct. for N. Dist. of California*, 834 F.2d 1444, 1450–51 (9th Cir. 1987), *Emami* itself "dealt with a treaty that, unlike the United States-Spain extradition treaty, required submissions to be made under oath." *In re Extradition Lanzani*, No. CV 09-07166GAFMLG, 2010 WL 625351, at *6 (C.D. Cal. Feb. 18, 2010). Here, the Extradition Treaty does not contain equivalent or analogous language requiring an oath. And to the extent that *Platko* imposes a more exacting requirement on hearsay statements, such proposition has been rejected by binding Ninth Circuit law. *See, e.g.*, *Manta*, 518 F.3d at 1146–47 ("[S]uch a requirement would run contrary to our well-established case law that evidence offered for extradition purposes need not be made under oath.").

Competent evidence supporting the Magistrate Judge's probable cause determination exists, both in the Scottish Prosecutor's Statement of Facts and in other documents separate from it. Since the terms of the Extradition Treaty do not present a higher evidentiary burden requiring that evidence supporting probable cause be presented under oath, the Court also rejects Petitioner's challenge over the probable cause determination.

## IV. CONCLUSION

For the reasons discussed above, the Court **DENIES** Petitioner's Petition for Writ of Habeas Corpus.

**IT IS SO ORDERED.**

Dated: January 12, 2022

Hon. Gonzalo P. Curiel
United States District Judge